In the Matter of the Application of GEORGE J. GILLESPIE et al., Constituting the Board of Water Supply of the City of New York, Respondents, to Acquire Real Property in Ulster County.

NEW YORK CENTRAL RAILROAD COMPANY, Appellant.

Third Department, December 29, 1942.

*Harry H. Flemming* for appellant.

*William C. Chanler, Corporation Counsel (Richard H. Burke* and *Paxton Blair* of counsel), for respondents.

BLISS, J.  This is an appeal from an order of the Special Term confirming the report of commissioners of appraisal, fixing the damages to be paid to the appellant as the result of the respondents' having acquired the right to empty waters from the Schoharie reservoir into the Esopus creek.  For previous decisions in this proceeding see *Matter of Gillespie* (272 N. Y. 18) and *Matter of Gillespie* (257 App. Div. 1059).  A previous commission fixed the damages with relation to fourteen riparian parcels owned by the railroad within the same area and many of them contiguous to one or more of the parcels involved in the present proceeding.  This present commission dealt with eighteen additional parcels owned by the railroad along the Esopus creek.

There are two elements of damage as to each of the eighteen parcels, namely, that which was actually suffered by the claimant prior to October 25, 1939, before the city instituted this proceeding and the damage incurred by the railroad on account of the acquisition by the city of a perpetual easement to empty the

waters from the Schoharie reservoir through the Shandaken tunnel into the Esopus creek and flow them through the natural channel of the Esopus along the railroad lands into the Ashokan reservoir, at all times except when the Esopus is at flood stage. A previous commission fixed the awards on the fourteen comparable parcels. (See *Matter of Gillespie*, 257 App. Div. 1059.) As to those parcels the awards, also involving a claim of the New York Central Railroad, were thirty-two per cent of the amount actually expended by the railroad on account of damages through washouts from August 1, 1933 to October 25, 1939. In the instant proceeding the award is three per cent of the amount actually expended by the railroad on the eighteen parcels here involved. As to so-called future damage, the awards of the first commission amounted to twenty-six and seven-tenths per cent of claimant's proof while the awards of the present commission are four and three-tenths per cent. The railroad's damage from washouts between August 1, 1933, the date when the New York Central acquired this branch line and October 25, 1939, the date when the city ceased to be a trespasser by the acquisition of a permanent easement to augment the flow of the Esopus, was $48,724.25 while the award was about three per cent of that amount or $1,475. For one parcel on which the railroad spent $28,951.22 to repair such damage, the award is $600. On another parcel on which the railroad spent $2,235.48 the award is $2. Just how much damage was actually caused to the railroad's lands by the tunnel waters during the times of damage between 1933 and 1939 is a sharp issue.

The watershed of the Esopus at the tunnel portal is seventy square miles and at Cold Brook near the beginning of the Ashokan reservoir is 192 square miles. The average stream flow of the Esopus at Cold Brook is 460 c.f.s. and the capacity of the tunnel is 1,603 c.f.s. The Esopus is a flashy stream varying from a minimum of 8 c.f.s. to a maximum of 55,000 c.f.s. at the highest recorded flood. Flood stage is conceded to begin at 14,240 c.f.s. The railroad's proof showed that the addition of the tunnel waters caused the moistening and softening of the natural banks of the stream and of the railroad embankment, making it necessary to give protection to the natural banks, and its embankments. This weakening causes them to deteriorate and give way more rapidly both when the stream is flowing within the natural banks and also when it is at flood stage. The addition of the tunnel waters to the average flow at Cold Brook increases the flow approximately 300 per cent at that point. I am unable to find in the record the average stream flow at the tunnel portal but, based upon the square miles of water shed

above each of those two points, the addition of the tunnel waters would increase the average flow a much greater percentage. It must also be borne in mind that these additional waters from the tunnel may be emptied into the Esopus at any times between flow of 8 c.f.s. up to a flow of 14,240 c.f.s. and the weakening of the natural banks and artificial embankments carries over into the flood periods. In view of these facts it is quite inconceivable that the portion of the actual damage to the railroad's lands by the addition of the tunnel waters was the almost negligible amount of three per cent and we find no reasonable basis in the record for such a determination.

As to the so-called future damage, the claimant's proof, including additional parcel No. 49, established that it would cost $378,345 to adequately protect the natural banks and railroad embankment against stream flow damage. The total award was $16,415 or four and three-tenths per cent of such cost. On four of the parcels the awards were $1 each. On one of these which the claimant showed it would cost $12,485 to protect, the award was $1. On another parcel which the claimant showed it would cost $14,088, the award was $279.

The city contended the awards for the acquisition of the easement should be nominal because it was necessary for the railroad to reinforce its embankments against the flow of the stream in its natural state, and this reinforcement would also take care of the comparatively insignificant damage, if any, caused by the induction of the Shandaken tunnel waters. Apparently the commission adopted this view as to some of the parcels. But we have already seen that the tunnel waters increase the average flow of the Esopus threefold at Cold Brook and several times more at the portal. Up to flood stage, these additional waters substantially contribute to the necessity for bank and embankment protection and their deleterious effect continues even above flood stage. The cost of protecting the natural banks and railroad embankments from both the natural and augmented flow may not all be assessed against the city as damages, but it must bear the portion of such burden caused by the increase in volume. Nominal awards obviously do not meet this requirement.

The city further continues, that if it be held that it caused some damage and it should be made to pay the proportionate share such damage bears to the whole damage suffered or to be suffered by the railroad from all causes, then the limits of such liability are the cost of paving certain strips of railroad embankment eighteen inches high, which was the maximum that could have been made wet by the addition of 1,063 c.f.s. to the

460 c.f.s. average stream flow. This cost was estimated by the city at $8,229. We see no justification for thus limiting the city's liability. Under the city's estimate, the strips to be paved were confined to those points along the railroad where the waters of the creek touched the artificial railroad embankment at a flow of 1,523 c.f.s., which is the tunnel capacity added to the average natural flow at Cold Brook. They do not include any protection to the natural banks, other railroad riparian lands or the railroad embankments affected between the water levels 1,523 c.f.s. and 14,240 c.f.s. or flood stage. Under the easement the tunnel waters may be emptied into the Esopus at any stage of the latter between 8 c.f.s. and 14,240 c.f.s. They may cause damage to the natural banks low in the bed of the stream below the 1,523 c.f.s. level or to the natural banks, riparian lands and embankments up to 14,240 c.f.s. level. Thus it is possible for the tunnel waters to damage the Esopus banks and the railroad's lands and embankments at any point between the levels of 8 c.f.s. and 14,240 c.f.s. And the damage is not all limited to the increased flow of the moment. The flow of previous periods against the lower banks or embankments might so deteriorate and weaken them that they would give way under the increased pressure of flood waters, even though at that moment the tunnel was closed. The paving of an eighteen-inch strip would not at times protect against the additional waters. At others it would protect against both the extra and the natural flow. Consequently the paving of strips only where the tunnel waters, when added to the average natural flow, would lave and penetrate the railroad embankments would in no sense indicate the range of the city's responsibility. If the railroad were to guard its banks completely from this augmented flow it would have to protect them from the lowest flow level up to the beginning of flood stage. While the commission might consider the city's estimate as some evidence of the extent of damage to be expected, it did not mark a limit beyond which the commission might not go. In view of all the proof the awards for future damage were not just compensation.

The order should be reversed on the facts with fifty dollars costs to the appellant and the motion of the appellant to set aside the report and for the appointment of a new commission granted, with ten dollars costs.

Hill, P. J., Crapser, Heffernan and Foster, JJ., concur.

Order reversed on the facts with costs to the appellant and the motion of the appellant to set aside the report and for the appointment of a new commission granted, with fifty dollars costs.